IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

RECEIVED

NOV  4 2004

| | | |
|---|---|---|
| IN RE:  COMPENSATION OF | § | AT 8:30 _____ |
| MANAGERIAL, PROFESSIONAL AND | § | WILLIAM T. WALSH |
| TECHNICAL EMPLOYEES ANTITRUST | § | CLERK |
| LITIGATION, | § | MDL 1471 |

THIS DOCUMENT APPLIES TO:

| | | |
|---|---|---|
| DONALD R. BAILEY, JAMES D. BOOKER | § | |
| DENNIS ALAN LETNEY, JAMES DARTEZ, | § | |
| SR., ROBERT TRAHAN, EDDIE ALLEN, | § | |
| AND ALL OTHERS SIMILARLY SITUATED | § | |
| | § | |
| V. | § | **CIVIL ACTION NO.:** |
| | § | 3:02-CV-2952 |
| AMOCO CORPORATION, BP | § | |
| CORPORATION NORTH AMERICA INC., | § | |
| ATLANTIC RICHFIELD COMPANY, BP | § | |
| AMERICA INC., CHEVRON CORPORATION, | § | |
| CHEVRON U.S.A. INC., CONOCO, INC., | § | |
| EXXON MOBIL CORPORATION, | § | |
| MARATHON OIL COMPANY, OCCIDENTAL | § | |
| PETROLEUM COMPANY, PHILLIPS | § | |
| PETROLEUM COMPANY, SHELL OIL | § | |
| COMPANY, SUN CO., INC. (R&M), TEXACO | § | |
| INC., UNION OIL COMPANY OF | § | |
| CALIFORNIA and UNOCAL CORPORATION | § | |

**AMENDED COMPLAINT**

1.    Since at least the latter part of the 1980s, and in each year since, Defendants have exchanged with each other detailed information concerning salaries, bonuses, and benefits paid to their employees. The purpose of these exchanges of information was and is to eliminate or minimize competition among Defendants with respect to the monetary compensation paid to their employees. The effect of these exchanges of information is and has been to keep the monetary compensation of the Defendants' salaried managerial, professional and technical ("MPT") employees lower than if the exchanges did not occur.

2.    The methods used by Defendants in furthering their conspiracy, in violation of federal antitrust law, include the exchange among Defendants of massive amounts of extremely detailed information concerning job classifications, salaries, bonuses, and benefits paid, or to be paid, to categories of employees within the different job classifications; starting salaries of new employees; "signing bonuses"; relocation expenses; stock options; and related information. This information is exchanged, analyzed, discussed, and compiled at periodic meetings that take place among various representatives of Defendants throughout the year. Updated information on salaries is exchanged in oral and written communications throughout the year.

3.    The information exchanged is for the most part not disclosed to the public or to employees generally nor to those other than those contributing the information. The confidential treatment of the information exchanged impedes the ability of employees to bargain intelligently and competitively with members of the information exchanges.

4.    Each Defendant uses the information obtained from its competitors to adjust the compensation it pays to its MPT employees with the effect that that compensation is lower than it would be but for these information exchanges.

1

5. On information and belief, certain of the information that is exchanged is exchanged for the sole purpose of stabilizing and harmonizing the compensation each Defendant pays to its MPT employees with that paid by the other Defendants to their MPT employees.

6. This case is brought by Plaintiffs Donald R. Bailey ("Bailey") and James D. Booker ("Booker), individually, and on behalf of a Class comprised of the Defendants' non-union MPT employees. Specifically, the Class is defined as:

> All salaried (FLSA-exempt) U.S.-based employees of any of the defendants (or their divisions or subsidiaries) who are currently employed as managerial, professional, or technical employees in jobs designated with Exxon salary classification levels CL 20-29, or equivalent salary classification levels of one of the other defendants, and who have been employed in the oil/petrochemical industry for at least two years. Excluded from the Class are all of defendants' human resources personnel who participated directly in the information exchanges that are the subject of the complaints in this action. (Class Members are hereafter referred to as "Targeted Employees").

7. This case is also brought by Plaintiffs Bailey and Booker and Plaintiffs Dennis Alan Letney, James Dartez, Jr., Robert Trahan and Eddie Allen, individually (hereinafter referred to as "Individual Plaintiffs") to recover damages as permitted by law, including treble damages and attorneys' fees caused by Defendants' agreement, combination and conspiracy alleged herein.

8. As a result of the agreement, conspiracy, and combination described herein, compensation of both the Targeted Employees and the Individual Plaintiffs was and continues to be lower than it would have been in the absence of the illegal conduct. The Targeted Employees and the Individual Plaintiffs were therefore injured within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1, and unless such conduct is enjoined or restrained the Targeted Employees will continue to be damaged in the future.

9. The conspiracy alleged herein consisted, inter alia, of an agreement among the

Defendants to exchange information concerning the compensation paid, and to be paid, to their MPT employees. The only business purpose of the agreed-upon information exchanges was to achieve coordination among Defendants of the compensation they paid to those employees and reduce that compensation. Pursuant to this agreement, Defendants exchanged such information, which exchanges were intended to, and had the effect of, reducing or eliminating competition among Defendants with respect to compensation paid, or to be paid, to their MPT employees. This information was exchanged before, during, and after meetings among the various Defendants. The exchanged information was used by the Defendants to set compensation levels for their MPT Employees, including Plaintiffs, at levels that were lower than they would have been in the absence of the information exchange.

**JURISDICTION AND VENUE**

10. This lawsuit arises under section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The Individual Plaintiffs seek to recover damages on their own behalf (including treble damages, costs and reasonable attorneys' fees) for the injuries they sustained by reason of Defendants' Sherman Act violations. Plaintiff Bailey also seeks, on his own behalf and on behalf of a class comprised of the Targeted Employees, injunctive and/or other equitable relief to prevent and restrain Defendants' violations.

11. The Court has jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, and under 28 U.S.C. §§ 1331 and 1337.

12. This lawsuit was originally filed in the U.S. District Court for the Eastern District of Texas, Texarkana Division, and was transferred to this Court for coordinated or consolidated pretrial proceedings by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407(a). Venue

3

is proper because each Defendant is found or transacts business in the Eastern District of Texas, and venue therefore exists pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22. In addition, each Defendant has sufficient contacts with the Eastern District of Texas so as to make it subject to personal jurisdiction in this the Eastern District of Texas were the Eastern District of Texas a separate state, and venue in this Court therefore exists pursuant to 28 U.S.C. § 1391(c).

## IDENTITY OF THE PARTIES

**A.    PLAINTIFFS**

13.    Plaintiff DONALD R. BAILEY ("Bailey") is an individual residing in Beaumont, Jefferson County, Texas. Plaintiff was a salaried employee of Mobil from 1970 until its merger with Exxon. He is currently a salaried, non-union MPT employee of EXXON MOBIL and is one of the Targeted Employees. Bailey brings this action individually, and on behalf of all other Targeted Employees of the Defendants.

14.    Plaintiff James D. Booker ("Booker") is an individual residing in Beaumont. Plaintiff was a salaried employee of Mobil Corporation from 1970 until its merger with Exxon. He is a current salaried non-union employee of EXXON MOBIL and is one of the Targeted Employees. Booker brings this action individually, and on behalf of all other Targeted Employees of the Defendants.

15.    Plaintiff DENNIS ALAN LETNEY ("Letney") is an individual residing in Lumberton, Hardin County, Texas. Letney was a salaried, non-union MPT employee of MOBIL OIL during the period 1973-2000. Letney brings this action individually to recover damages for the injuries he sustained on account of Defendants' wrongful conduct.

16.    Plaintiff JAMES DARTEZ, SR. ("Dartez") is an individual residing in Bridge City,

Orange County, Texas. Dartez was a salaried, non-union MPT employee of MOTIVA Enterprises LLC, a joint-venture of Shell Oil Co. and Saudi Aramco, during the period 1969-2002. Dartez brings this action individually to recover damages for the injuries he sustained on account of Defendants' wrongful conduct.

17.    Plaintiff ROBERT TRAHAN ("Trahan") is an individual residing in Beaumont, Jefferson County, Texas. Trahan was a salaried, non-union MPT employee of PREMCOR, (which was a division of Chevron until it was sold in 1995) during the period 1969 to the present. Trahan brings this action individually here also to recover damages for the injuries he sustained on account of Defendants' wrongful conduct.

18.    Plaintiff EDDIE ALLEN ("Allen") is an individual residing in Old Ocean, Brazoria County, Texas. Allen was a salaried, non-union MPT employee of PHILLIPS during the period 1990 to 2000. Allen brings this action individually here also to recover damages for the injuries he sustained on account of Defendants' wrongful conduct.

## B.    DEFENDANTS

19.    Defendant EXXON MOBIL CORPORATION is a multi-national corporation engaged, *inter alia*, in the petroleum and petrochemical businesses in the United States. It is incorporated under the laws of the State of New Jersey. On November 30, 1999, Exxon Corporation changed its name to Exxon Mobil Corp., and Mobil Corp. merged with and itself became a wholly-owned subsidiary of the renamed Exxon Mobil Corp. Exxon Mobil Corp. has its headquarters in Irving, Texas. As used herein, references to Exxon are to that corporation both before and after its name change on November 30, 1999.

20.    Defendant MOBIL CORPORATION is a multi-national corporation engaged, *inter alia*,

in the petroleum and petrochemical businesses in the United States. It is incorporated under the laws of Delaware. On November 30, 1999, Mobil Corp. merged with and became a wholly-owned subsidiary of Exxon Mobil Corp. As used herein, references to Mobil are to that corporation both before and after its merger with an Exxon subsidiary on November 30, 1999.

21. Defendant BP AMERICA INC. is, and at all relevant times has been, a subsidiary of what is now known as BP p.l.c. BP America has its chief office in Warrenville, Illinois and is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States.

22. Defendant BP AMOCO CORP. is a wholly-owned subsidiary of BP p.l.c. and was known as Amoco Corp. before its merger with what was then known as British Petroleum Company p.l.c. (and is now known as BP p.l.c.) in December 1998. BP Amoco Corp. is an Indiana corporation with its principal office in Ohio and is, and at all relevant times has been through subsidiaries, engaged in the petroleum and petrochemical business in the United States.

23. Defendant ATLANTIC RICHFIELD COMPANY became a wholly-owned subsidiary of BP p.l.c. on or about April 14, 2000, before which it was an independent company. It is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States.

24. Defendant CHEVRONTEXACO CORP. is a Delaware corporation with its principal office in San Ramon, California and is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States. On October 9, 2001, a wholly-owned subsidiary of Chevron Corporation, a Delaware corporation ("Chevron"), merged with and into Texaco Inc., a Delaware corporation ("Texaco"). As a result of the Merger, Texaco became a wholly-owned

6

subsidiary of Chevron, and Chevron changed its name to ChevronTexaco Corporation. As used herein, references to Chevron Corp. are to that corporation before its name change on October 9, 2001.

25.    Defendant TEXACO INC. is a Delaware corporation with its principal office in San Ramon, California and is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States. It was until October 9, 2001 an independent company, but on that day became a wholly-owned subsidiary of Defendant ChevronTexaco Corporation. It is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States.

26.    Defendant CONOCO INC. is engaged in the petroleum and petrochemical business in the United States. On August 30, 2002, Conoco became a wholly-owned subsidiary of Defendant ConocoPhillips.

27.    Defendant PHILLIPS PETROLEUM COMPANY is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States. On August 30, 2002, Conoco became a wholly-owned subsidiary of Defendant ConocoPhillips.

28.    Defendant CONOCOPHILLIPS is, and at all relevant times after August 30, 2002 has been, engaged in the petroleum and petrochemical business in the United States. On August 30, 2002, Conoco became a wholly-owned subsidiary of Defendant ConocoPhillips. It is the parent corporation of Defendants Conoco and Phillips and has its principal offices in Houston, Texas.

29.    Defendant MARATHON OIL COMPANY is an Ohio corporation, which is, and at all relevant times has been, engaged in the petroleum and petrochemical business in the United States with its corporate headquarters in Houston, Texas. At all relevant times until on or about July 2,

7

2001 it was a subsidiary and part of the Marathon Group of USX Corp., a Delaware corporation. It is now a wholly-owned subsidiary of Marathon Oil Corp., a Delaware corporation.

30.  Defendant OCCIDENTAL PETROLEUM CORP. is, and at all relevant times has been, engaged in the petroleum and petrochemical businesses in the United States. It is incorporated under the laws of Delaware and has its corporate headquarters in Los Angeles, California.

31.  Defendant SHELL OIL COMPANY is, and at all relevant times has been, engaged in the petroleum and petrochemical businesses in the United States. It is incorporated under the laws of Delaware and has its corporate headquarters in Houston, Texas.

32.  Defendant SUNOCO, INC. (R&M) is, and at all relevant times has been, engaged in the petroleum and petrochemical businesses in the United States. It is incorporated under the laws of Pennsylvania and has its corporate headquarters in Philadelphia, Pennsylvania. It is a subsidiary of Sunoco, Inc., a Pennsylvania corporation.

33.  Defendant UNOCAL CORP. is, and at all relevant times has been, engaged in the petroleum and petrochemical businesses in the United States, through its wholly-owned subsidiary Union Oil Company of California. It is incorporated under the laws of Delaware and has its corporate headquarters in El Segundo, California.

34.  Each Defendant competes with each other Defendant for hiring and retaining of Targeted Employees.

8

## CLASS ACTION ALLEGATIONS

### A.    CLASS DEFINITION

35.  Plaintiffs Bailey and Booker bring this action on their own behalf and on behalf of the Class defined in paragraph 6 hereof, pursuant to Rules 23(b)(1) and 23(b)(2) of the Federal Rules of Civil Procedure.

### B.    RULE 23(a) REQUIREMENTS

36.  **Numerosity**:  While the exact number of members of the Class can only be determined by appropriate discovery, the Class members number in the tens of thousands.  The Class is so numerous that joinder of all members is impractical.

37.  **Commonality**:  Common issues in this case include the existence of a conspiracy among the Defendants to limit competition in salaries paid to the Targeted Employees, whether each Defendant participated in the conspiracy and whether the conspiracy should be enjoined. Common questions include:

(a)    whether Defendants agreed among themselves to exchange information concerning compensation paid, or to be paid, to their MPT employees;

(b)    whether Defendants participated in meetings at which information was exchanged concerning compensation paid, or to be paid, to their MPT employees;

(c)    whether Defendants obtained information from each other, directly or indirectly, concerning compensation paid, or to be paid, to their MPT employees;

(d)    whether and to what extent Defendants used information concerning compensation paid, or to be paid, to their MPT employees;

(e)    whether and to what extent Defendants used information concerning compensation

9

paid, or to be paid, by other Defendants to their MPT employees in a manner that adversely affected Targeted Employees;

(f)     whether Defendants' conduct had and continues to have the effect of depressing the salary structures governing the salaries of the Targeted Employees;

(g)     whether the compensation of the Targeted Employees was lower than it otherwise would have been in the absence of the information exchange; and

(h)     whether Defendants should be enjoined from continuing to violate the Sherman Act.

38.   **Typicality**: The claims of Plaintiffs Bailey and Booker are typical of the claims of the other members of the Class.  Plaintiffs Bailey and Booker have been and continue to be injured by the same conspiracy to limit competition and fix MPT salaries as the absent class members.

39.   **Adequacy of Representation**:  Plaintiffs Bailey and Booker and their counsel will adequately represent the Class.

C.     **RULE 23(b)(1) and 23(b)(2) REQUIREMENTS**

40.   Certification of the Class is appropriate pursuant to Rule 23(b)(1) because prosecution of separate actions by individual members of the Class would create a risk of:

(a)     inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, the parties opposing the Class, or

(b)     adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

41.   Certification of the Class pursuant to Rule 23(b)(2) is appropriate because Defendants,

10

the parties opposing the Class, have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## INTERSTATE TRADE AND COMMERCE

42.  The conduct of Defendants described in this Amended Complaint is in, and has affected, interstate trade and commerce. Defendants' collective annual revenues are measured in billions of dollars. Their products are sold throughout the United States, and they employ people throughout the United States.

## FACTS

43.  Defendants are the largest oil companies in the United States, and most are extensively involved in the chemical and petrochemical industries as well.

## A.    SALARY STRUCTURE

44.    The compensation systems of Defendants are similar to one another. Each of the Defendants' MPT employees is in an assigned salary grade or classification level that falls within the company's core compensation structure, *i.e.,* each company's series of sequentially numbered salary grades covering its MPT employees. These salary grades are somewhat analogous to the GS or JS salary grades used by the federal government. The similarity of Defendants' compensation systems both allow for the exchange of specific compensation information and permit the coordination of salaries and compensation levels among the companies.

45.  For instance, the MPT jobs at Exxon are assigned the grade or classification levels of CL20 through CL29. Jobs in classification levels CL30 and above are executive positions and jobs in levels below CL20 were salaried clerical or other staff positions. Each other Defendant's compensation structure was similarly organized, although the specific numerical designation of its

11

MPT classification levels, and the number of such levels, differed from company to company. For instance, before its merger with Exxon, Mobil's MPT employees were in salary grades (or classification levels) 11 through 19; Marathon's were in grades 8 through 18; Occidental's were in grades 050-100 and M01-M05; and so on.

**B.    DATA EXCHANGES**

46.   Beginning at least as early as 1987, Defendants engaged in extremely detailed exchanges of information about the salaries and other compensation they paid in various comparable MPT positions and about Defendants' expected movements both for base salary and variable or incentive pay in the upcoming year.  These exchanges of information were made both through a third-party independent consultant (Towers Perrin) and directly with one another, in face-to-face meetings and otherwise.

47.   These information exchanges were prepared and distributed under the auspices of a group known as the Oil Industry Survey Group (OIG).  During the 1990s and continuing to the present, the OIG consisted of Defendants:  Amoco, Arco, BP America, Chevron, Conoco, Exxon, Marathon, Mobil, Occidental Petroleum, Phillips, Shell, Sun, Texaco, and Unocal.

48.   To be a member of the OIG, a company had to match at least 40% of the Chevron benchmark jobs, described below.  Each member had to submit complete and accurate historical compensation data including salaries, differentials, bonuses, incentives, allowances, supplements, stock, stock unit overrides, and participation agreements and to allow that information to be audited if asked.

49.   The OIG Charter mandated participation in five yearly or bi-yearly surveys:  the Oil Industry Job Match Survey, the Oil Industry Job Family Survey, the Exxon Technical and

12

Professional Starting Salary Survey, the Job Match Long-Term Incentive Survey, and the Above Base Compensation (ABC) Survey. In addition to these mandated surveys, there were numerous other additional surveys conducted for the OIG.

50. The Steering Committee of the OIG consisted of those companies that coordinated the Oil Industry Group surveys. At various times throughout the relevant period different OIG participants were members of the steering committee and each Defendant routinely participated in steering committee meetings. The Steering Committee reported the goings-on and results of its meetings to the other members of the OIG and solicited their agreement to the Steering Committee's proposals.

## 1.   **Job Match Survey**

51.   The oil industry's most comprehensive analytical tool in measuring employee remuneration is the OIG Job Match Survey. The Job Match Survey is an important element of a system to achieve a common denominator with respect to compensation of the participants' MPT Employees. Since such employees of Defendants number in the tens, and perhaps hundreds, of thousands, with scores of different job titles, job descriptions, and job responsibilities, Defendants realized it was not functionally efficient simply to know what each others' employees were being paid unless they were able to horizontally match the various job classifications.

52. Of the fourteen Defendants that participate in this job match process, Chevron takes the lead role in coordinating the biennial Job Match Survey. Defendants agreed to, and did provide to each other full, accurate, and relevant information on jobs by means of job descriptions, organization charts, and other documents, so that evaluations of job comparability could be made among the Defendant companies. Defendants agreed to and do provide to each other information on jobs in

13

each of their companies, so that the jobs are most nearly comparable to the benchmark jobs provided by Chevron in order that they can be matched. A "match" is defined as a similar job in a similar organization whose combined reporting functions and scope adjustments are not more than two survey salary grades above or below the benchmarked job.

53.    Every other year, each Defendant submits detailed information with respect to the various job categories in its structure, and an effort is then made to match these job categories to the benchmark jobs. Chevron sends to each Defendant an elaborate survey request, including job match sheets, organization charts, and a computer diskette. Chevron's jobs are used as industry benchmarks. Chevron and Unocal each meet with half of the other companies to seek to develop job-to-job matches to the Chevron benchmarks. They then compile the information, reconstruct it in written and diskette form, and submit it to the Valhalla, New York office of Towers Perrin, a third party consultant ("Towers Perrin"), which is also sent salary information from each Defendant. Towers Perrin then compiles the information and analyzes, refines, and distributes it to Defendants, in diskette form and hard copy.

54.    Since not all jobs can be matched precisely, there are agreed upon offsets that reflect responsibility differences for each job, assigning a premium to the employee in a particular position who had greater responsibility to the comparable Chevron employee and discounting the salary of those with fewer responsibilities than their Chevron counterparts. This process was reflected as a percentage figure. Defendants agreed that the salary for each grade shall differ at their midpoints by 14% for purposes of the job match survey. Having leveled the playing field, so to speak, Defendants are then in a position to divulge meaningful information concerning compensation paid, or to be paid, to the MPTs.

14

55.   As a part of this process, then, every two years, a Chevron or Unocal representative visits each of the other OIG members to match the benchmark Chevron jobs with each Defendant's most similar job.   Compensation and functional (line management) representatives attend each session. An evaluation is assigned to each job and an appropriate "offset" is agreed upon for each job. The offset is a means for accounting for the different responsibilities between specific OIG member's jobs and similar Chevron jobs. Each grade level is assumed to have a salary difference of 14%, which roughly corresponds with the difference of the midpoints in the classification levels. The jobs then are compared by assigning a fraction of 14% to the different job responsibilities to equate the matched jobs. There is an agreed upon maximum of two grade levels, or 28%, for jobs to "match."

56.   The actual salaries of the incumbents are apparently not discussed by the participants at the Job Match Meetings, but the percentage figure or adjustment factor is agreed upon between the job matchers. The Job Match Survey information "agreed to at our meetings," as an Exxon employee put it, is sent in diskette form to all participants. The adjustment or offset factor for each of the jobs on the Job Match Survey and the actual salary information is then transmitted to Towers Perrin, which applies the percentage figure adjustments to the actual salary.

57.   These matched jobs are grouped by Towers Perrin to accord with the OIG members' classification level and arranged from the highest to lowest salary with each of ten 3-5 year age categories. The 50th percentile of pay is determined for each of the ten distributions of salaries within the age categories. This thus displays for each OIG member how its competitors are paying their employees for comparable jobs.

58.   In Exxon's case, for example, the comparable Exxon salaries for the matched jobs are

arrayed by classification levels and by age groups at the 50th percentile ranking. The competitors' data are then compared for each age group within each classification level by weighted averaging based on the Exxon age distribution within the classification level, thus enabling Exxon to compare its pay levels to those of its competition at the 50th percentile across all classification levels. This process enables Exxon to develop its "competitive position" which determines, to a large extent, its annual salary budget which in turn determines how much individual MPT employees are paid.

59.   Because of the scope of the Job Match Survey, it is considered far more reliable than information collected in other surveys and is heavily relied on by the OIG participants to monitor the "competitive position" of their exempt salary programs. In other words, the detailed job match information is used to determine where each company is *vis-à-vis* the other OIG members, as well as where each wants to set the salary and compensation levels of their MPT employees in the future.

2.    **Job Family Survey**

60.   The Job Family Surveys are administered by Towers Perrin. The Job Family Survey is coordinated by Exxon and it gathers information on approximately thirty job families. It is conducted annually, with each participating company providing annual data as to the salary, experience level, and academic level of MPT employees by job level classification.

61.   Each participating company receives from Towers Perrin information from other participants both in written and computer disk form. During at least some of the period between 1990 and the present, each participating company could receive a break-down of data from as few as three of its competitors. At various times, for example, Exxon received data break down from only three of its competitors – the three highest paying companies in the oil industry, sometimes referred to as the "High Three." In addition, Exxon, for example, has designated and received data

16

grouped by six other major oil companies, Amoco, Arco, Chevron, Conoco, Mobil, and Shell, also referred to by Exxon as the Six Majors. The other OIG members receive data from their selected group of companies — sometimes called their "frame of reference."

62. During most of the relevant period, the Exxon salaries were compared with those of the Six Majors as a group in the 10th, 50th, and 90th percentile performance grade ranking. For the period 1987 through 1994, for example, Exxon salaries dropped 4.1% as compared to the Six Majors.

63. The data provided by the Job Family Survey are utilized by each Defendant to determine if the announced budgets of its competitors were implemented in whole or in part so that each could consider what compensation action should be undertaken to coordinate the salaries with those of the participants in the information exchange.

### 3.    Direct Exchanges of Information

64. Besides formal exchanges of "anonymous" survey data through a third party entity like Towers Perrin, Defendants engaged in numerous exchanges of information *directly* with one another. These direct exchanges involved a variety of topics, like planned changes to salary budgets and structures for the coming period, the type and prevalence of variable pay programs, rates of attrition for certain categories of employees, salary ranges for years of experience, and other special projects.

65.    In about 1990 it became apparent to Defendants that the accuracy of the salary comparisons they exchanged was adversely impacted by the fact that companies were paying amounts above base compensation. At the initiative of Shell, Defendants agreed to exchange data concerning variable pay amounts. This survey became known as the ABC Survey (Above Base Compensation). It captured the amounts that Defendants pay that were not captured in the Job

17

Match and Job Family Surveys.

66. In the Above Base Compensation (ABC) Survey, survey participants directly exchanged information about variable pay. The precursor to this survey was the "Other" (or Non-traditional) Pay Elements Study, which appears to have been initiated in early 1991. Until 1995, when the ABC survey was formally incorporated into the Job Family and Job Match Surveys, this study was coordinated by Shell and involved a direct exchange of company-specific information. Even after its incorporation into the Job Family and Job Match surveys, Defendants continued to exchange variable pay information directly with one another.

67. The ABC survey measured the number of recipients, total payout, and average payout under each variable pay plan offered at each company. These data were then compared against each company's total exempt workforce to gauge significance of non-traditional pay to overall compensation.

68. The reports of these data identified the individual companies and the amount of Above Base Compensation each was paying. The data exchanged in the ABC Survey enabled each Defendant to more accurately compare the levels of pay each other Defendant is paying.

69. There were other direct exchanges of information as well. Under the auspices of the OIG, additional information is collected from Defendants as to bonuses and other non-standard payments and disseminated among Defendants. These surveys are known by the code names B-1, B-2, and S-1 and they enable each Defendant to more accurately compare what they are paying certain of their MPT employees. The B-1, B-2 and S-1 surveys are not company-blind. Each company exchanges data directly with the other participants so each knows specifically what the others are doing.

18

70.    Another direct exchange was the Hierarchy Study in which Exxon, Arco, Chevron, Shell, Sun, and Unocal participated. The study analyzed years of service per grade for each job family identified in the Job Family Survey. This study was coordinated by Shell and its purpose was to determine level of "experience," or the sum of years of service and years spent in higher education. The participants in the survey exchanged information with one another as to the average age, average years of service, and average level of higher education attained at each grade level in each job family.

71.    An additional refinement in the information exchanged is the Long Term Incentive Survey. This survey captures the economic impact of certain benefits that are granted by Defendants to their employees that were not immediately equal to cash. Defendants agreed that these would be accounted for at 40 percent of their face value.

72.    Some Defendants even distributed copies of their compensation strategies to their competitors. For example, OIG members also exchanged retention strategies for highly prized drillers, engineers, geoscientists and other technical professionals.

**MEETINGS**

73.    Throughout the relevant period and under the aegis of the OIG, Defendants' human resources representatives met regularly, at least three times a year, and often as much as five times per year.

74.    During these meetings, detailed and specific information was discussed regarding, among other things, planned salary budgets and salary structures for various categories of employees. At these meetings, the OIG participants revealed:

(a)    The percentage of any planned merit increases, that is, the percentage by which their

19

salary budget would increase the following year.

(b)     The planned percentage change to overall salary structures necessary to align their salaries to those of the competition. This figure was referred to by some members of the OIG as the "structural change."

(c)     The effective date and implementation schedule for the various salary adjustments for the year (*i.e.*, whether changes would be on a date certain or on a rolling basis).

(d)     Details about variable pay plans.

75.   This information exchanged at these face- to-face meetings was company-specific, *i.e.*, all participants learn where each other participant is going with its salary budget for the upcoming year or, if a participant's salary year had only recently begun, for that new year.

76.   One of these annual meetings is the Oil Industry Compensation Roundtable, held between August and October of each year. The Roundtable is a meeting of compensation executives from the fourteen companies that participate in the Oil Industry Survey Group plus, at various times, Ashland, Hess, Saudi Aramco, Equiva and Tosco.

77.   One of the things discussed at the Roundtable Meetings are the salary budgets broken down for executive employees, exempt employees (*i.e.*, MPTs), and non-exempt employees. Participants reveal, on a company-specific basis, the percent of any merit increase, the percent of structure change, and the effective date and the implementation schedule, whether rolling or common date, for the various salary adjustments for the year. Other details are also revealed, such as whether a particular company has set aside an additional amount for merit exceptions and whether a company is going from a rolling (employment anniversary) date to a common date (or vice versa) for salary adjustments.

78.   Most of this information is not made publicly available. Many of the companies do not

20

reveal to their own affected employees the detail that is revealed to their competitors at these meetings.

79. The meeting participants also prepare in advance certain topics for discussion, and these are printed out in the form of questions and distributed at the meetings on a sheet set up so that the response of each company can be conveniently recorded, *e.g.*, Exxon can record Shell's and Chevron's responses. Among the questions that have been directed to and answered by all meeting participants at these meetings are, "is there a special compensation program for new hires?," "do any companies use lump sum merit increases on an ongoing basis?," "is there any move to consider non-oil companies in the competitor group and/or changing percentile target?," and "does the participant communicate its competitive salary position to its employees?" (most do not).

80. Among the topics discussed at these meetings are the nature and amount of discretionary awards programs, the practice for setting nonexempt salary ranges, the number and some examples of different professional ladders that exist, the trending of traditional bonuses available to entry level employees, and the promotional increases that are given.

81. In addition to the Roundtable Meeting, Defendants' human resource personnel also routinely met at the beginning of each calendar year, in January or February at the Steering Committee Meeting. At these meetings as well, Defendants exchanged company-specific information regarding their planned or newly implemented merit budget measures and structure changes. Exxon, for example, a leader among Defendants on compensation issues, discloses at these meetings in January or February its new compensation programs which had been implemented as of on January 1 of that year. Other companies, whose compensation programs begin later in the year – in April or July for example – would have foreknowledge of Exxon's programs prior to

implementation of (and in some cases approval of) their own. On occasion, companies would reveal their intentions with respect to their upcoming compensation programs prior to the time that their own programs were officially adopted and revealed to the employees.

82.   In addition to the Roundtable Meetings and the Steering Committee Meetings (which were held several times per year) there were also "Planning Meetings" and "Analyst Meetings." At these meetings human resource representatives of most, if not all, Defendants were present. Face-to-face meetings of Defendants' representatives occurred at least three times, and often as many as five times per year.

83.   In addition to the formal meetings, there were countless more informal communications, whereby Defendants' human resources personnel gathered "intelligence" from their contacts at other companies.   Thus, on at least some occasions Defendants knew precise information about their competitors' compensation programs, including their variable pay plans, prior to the adoption of their own programs.

84.   On information and belief, the essential nature and characteristics of Defendants' information exchanges have remained unchanged since at least 1990, and the practices described above continue today.

## USE OF INFORMATION EXCHANGED

85.   The information exchanges complained of herein are utilized by Defendants to set their salary levels at levels lower than would be the case if the information was not so exchanged.

86.   Defendants' compensation objective is to align their compensation with that paid by each Defendants' respective competitors at each grade level, and to be even with the average salaries paid by each Defendants' respective comparator group.   Alignment with other oil companies is

22

generally sought, not just for oil industry-specific or technical jobs, but for all MPT jobs with the organization.

87.  Although Defendants referred to data from non-oil industry companies for comparison, they relied on the OIG survey information in actually setting compensation. Merit budget and salary range adjustments and variable pay plans were expressly based on information from competitors about their expected changes.

88.  The information exchanges herein were accompanied by assurances from Defendants herein that they would primarily utilize salary information exchanged among themselves in setting the salary for their MPT employees. Although various Defendants primarily use different subsets of the information exchanged to determine their salary levels, the total information exchanged among Defendants and the information supplied by Defendants and certain others contribute to the assurance and understanding among Defendants that maintaining a low level of salary increases runs little competitive risk.

89.  Defendants' exchanges of information facilitated the coordination and alignment of their MPT compensation levels at ranges below the ranges that would have prevailed in a truly competitive market.

90.  After Defendants had succeeded in aligning their compensation with one another, and slowing industry compensation growth, they began to look more closely at how their salaries compared with "general industry" and to discuss *alignment* downward toward general industry levels.  Defendants recognized their interdependence with respect to pay levels and together embarked on an effort to slow down industry pay.  Defendants recognized that oil industry pay scales were considered as a "unit" to remain aligned with one another in their movement towards

23

general industry.

91.  The success of Defendants' efforts to slow down compensation growth is shown in an analysis of the adjustments made by Exxon to its advancement guides and its "competitive factor."

92.  When the 1993 Job Family Survey Data indicated the pay levels for several job families were above the competition's, an 0.0% "competitive factor" was approved at Exxon to help correct the situation. The "competitive factor," also referred to as "structure change," is a percentage figure which expresses the amount by which Exxon's salary structure increases over the previous year's structure. The "0.0% competitive factor" *i.e.,* "no structure change", was implemented to align Exxon's salaries with those of its major competitors, generally defined by Exxon as the Six Majors (Amoco, Arco, Chevron, Conoco, Mobil, and Shell) other than Exxon.

93.  To achieve coordination with the salary levels of other participants, Exxon officials recommended changes in its Advancement Guides. Within Exxon, Advancement Guides establish requirements for advancement with the salary grade of employees and thus control the timing of salary increases. By slowing the rate of advancement (increasing the interval between pay raises), Exxon lowers the annual cost of employee salaries and thus achieves a salary level more in line with competitors' pay.

94.  The result of these adjustments was to slow the advancement rate at Exxon by two to eight years. These changes allowed Exxon to lower its competitive factor. Exxon's competitive factor declined during a portion of the relevant period as follows :  1991 - 6.5%; 1992 - 5.5%; 1993 - 2.5%; 1994 - 1%; 1995 - 0%.  These changes enabled Exxon to reduce its pay *vis-à-vis* its competitors from 110.7% in 1987 to 107.0% in 1993.

95.  By use of the information exchanged, Exxon moderated its salary structure over the

24

period since 1990 to more closely align it with competition. As a result of lower "competitive factors" and changes in the Advancement Guides that resulted from data exchanges of the sort described herein, Exxon's Job Family Index moved closer to Exxon's competition and the indices of over 80% of the families were lower than they had been in 1987.

96.   The adjustments made by Exxon to its "competitive factor" as a result of the data it received about the salaries paid by the OIG participants had an effect on the salaries paid to every Exxon MPT throughout the relevant period. In other words, had Exxon's "competitive factor" been higher than it was, *all* Exxon MPT salaries would have been higher than they were. Exxon's "competitive factor" was reduced *because* it received information concerning its competitors' salaries in the information exchanges described herein.

97.   From 1987 to 1993 Exxon's salary index versus its competitors declined 3.6%. With a budget of $800 million this represents a savings of $20 million per year. This does not take into account that the group as a whole (the fourteen companies) experienced a decline in the rate of salary growth that would otherwise have been experienced but for their agreed exchanges.

## ANTICOMPETITIVE EFFECTS

98.   The purpose and effect of the information exchange programs was for Defendants to align their compensation, to slow the rate of growth of MPT employee compensation and to exert an overall downward pressure on industry salary growth.

99.   As a result of the exchanges of detailed information on a regular basis throughout each year described herein, each Defendant knows what each other Defendant is paying to its MPTs at various job levels and adjusts its compensation package accordingly. The net effect of this anti-competitive conspiracy has been to chill, to stifle, or to eliminate competition with respect to

compensation paid by Defendants to the Targeted Employees.

100.  Defendants are in the labor market for MPT salaried, non-union employees in the integrated oil and petrochemical industry in the United States.  Plaintiffs Bailey and Booker and the other members of the Class are salaried, non-union employees in the oil and petrochemical industry, and therefore are part of the market in which Defendants obtain labor.  Defendants, employers in the oil and petrochemical industry, have market power over their employees because the workers' marketability, taking into account the knowledge accumulated as a worker in the industry, is of more value to employers in the integrated oil and petrochemical industry than to employers in other industries.  The MPT employees gain industry-specific knowledge as they work in the integrated oil industry, and this knowledge is of greater value to those employers in this industry than it is to employers in other industries.  The value of industry-specific knowledge to Defendants is shown by the fact that more experienced workers are paid more and that Defendants generally rely on other integrated oil companies when determining their salary levels.  As the employees gain experience, the only practical outlets to sell their services at an amount reflecting the value of their experience are the integrated oil and petrochemical companies, *i.e.*, Defendants.

101.  Throughout the relevant period, Defendants conspired to avoid competition in that market in violation of the antitrust laws by exchanging compensation information with each other so as to depress compensation levels of their MPT employees, including the Targeted Employees.

102.  The activities complained of herein have had an adverse effect on competition for the services of MPT employees in the integrated oil and petrochemical industry in that the salary levels for all employees within that market and various submarkets thereof have been and continue to be substantially lower than if it were not for the agreements, combination, and conspiracies and conduct

26

set forth herein.

103. Absent the conduct complained of herein, each Defendant would have an incentive to bid up the salaries of experienced employees to retain employees who might leave because of higher compensation elsewhere in the integrated oil industry.

104. Detailed knowledge of what their competitors pay for labor, an important component of each Defendant's total cost structure, has caused a general acceptance in the industry of relatively standardized wage rates and lessened competitive efforts to bid up wage levels. The reliance of employers in the integrated oil industry upon the information exchanged facilitates the tendency toward wage stability, thereby encouraging "tacit" wage fixing.

105. The Individual Plaintiffs and the Class have been injured in their business and property on account of Defendants wrongful conduct alleges herein. Unless such conduct is enjoined and restrained, the Class will continue to be injured in the future.

## THE RELEVANT MARKETS

### A.    The Geographic Market

106. The activities complained of herein affected and continue to affect the market for salaried, non-union employees with experience in the oil and petrochemical industry and performing services throughout the continental United States and various submarkets therein.

### B.    Product Market

107. The relevant product market is that for the services of experienced salaried, non-union, managerial, professional and technical (MPT) employees in the oil and petrochemical industry, in the continental United States and various submarkets thereof. MPT employees with experience in

this industry have industry-specific knowledge which renders their services more valuable to oil and petrochemical companies than to other companies. Competition for their services is thus effectively limited to the oil and petrochemical companies.

108.  The wages and salary levels for MPT employees experienced in the integrated oil and petrochemical market are as a practical matter set to the levels determined by the major oil companies, virtually all of which are Defendants herein.

109.  The oil and petrochemical companies, Defendants herein, perceive and recognize the relatively low level of cross-elasticity of demand for the services of MPT employees with experience in the oil and petrochemical companies as between the oil and petrochemical industry and other industries because they rely primarily on integrated oil and petrochemical industry salary information in setting salary and wages for the experienced MPT employees.

110.  The information exchanges here challenged substantially and adversely affected compensation competition for the services of all MPT employees with experience in the oil and petrochemical industry.

111.  The major oil companies, Defendants herein, have substantial collective market power *vis-à-vis* MPT employees with experience in the oil and petrochemical industry because these companies control a substantial number and a substantial percentage of job positions that are available for those with experience in the oil and petrochemical industry. Defendants perceive their competitors as the other Defendants, with which they compete for business. They also perceive the market in which they compete for the quality, experienced personnel they need to be comprised of the MPT employees of each other. The companies named as Defendants herein employ approximately 80-90 percent of the MPT employees in this market. Defendants also account for approxi-

28

mately 80-90 percent of the revenue garnered by integrated oil and petrochemical companies. Barriers to entry into the integrated oil and petrochemical industry are exceptionally high.

## VIOLATIONS ALLEGED

112.    The aforesaid agreement, combination, and conspiracy consists of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were to lower, stabilize, and maintain at deflated levels the compensation packages that Defendants paid to their MPT employees.

113.    For the purposes of forming and effectuating the aforesaid agreement, combination, and conspiracy, Defendants have done those things that they agreed, combined, and conspired to do. In furtherance of aforesaid agreement, combination, and conspiracy, Defendants have committed one or more overt acts, including:

(a)    Exchanging data throughout each year concerning compensation paid to or to be paid, to their MPT employees;

(b)    Participating in numerous meetings each year among representatives of Defendants at which there was an exchange of data about the compensation paid by them to their MPT employees;

(c)    Exchanging compilations of the data obtained at theses meetings; and

(d)    Using the data obtained from each other to establish the compensation paid by them to their MPT employees.

114.    Defendants' conduct described above is ongoing and unless enjoined, will continue.

115.    Defendants' exchange of information supports an inference of a price-fixing agreement with respect to MPT salaries.  Such price fixing constitutes a *per se* violation of Section 1 of the

29

Sherman Act.

116. Given the structure of the industry (Defendants control 80-90% of the market) and the nature of the information exchanged (including current and future budgeting information), Defendants' exchange of salary information also violates the Sherman Act under "rule of reason" analysis.

### FRAUDULENT CONCEALMENT

117. Defendants fraudulently concealed the existence of the wrongful acts alleged above and of the violations alleged herein. The conspirators generally have not disclosed to their employees the information they exchanged, other than to top management and human resources managers. Plaintiffs were ignorant of such wrongful acts, and exercised due diligence to learn of their legal rights and, despite such diligence, could not have uncovered the existence of the violations alleged herein until January of 1997. Given its nature, the conspiracy was inherently self-concealing.

### AS A FIRST

### CLAIM FOR RELIEF

#### (Injunctive Relief: Section 1, Sherman Act)

118. Plaintiff repeats the allegations of paragraphs 1 through 117 herein.

119. Beginning at a time uncertain, but at least before 1990, and continuing through the present time, Defendants entered into and engaged in a conspiracy in unreasonable restraint of inter-state trade and commerce in violation of Section 1 of the Sherman Antitrust Act of 1890, by combining among themselves to fix, lower, stabilize and/or depress the compensation paid, or to be paid, to their respective MPT employees.

120.    As a result of this unlawful conduct, the Plaintiffs Bailey and Booker and the Class have received compensation materially below what they would have received but for such conduct.

121.    Defendants' unlawful conduct is continuing, and unless equitable relief is granted, the salaries paid to Plaintiffs Bailey and Booker and the Class will be lower than they would be in an uncontaminated marketplace.

122.    Plaintiffs Bailey and Booker and the other members of the Class have no adequate remedy at law.

**AS AND FOR A SECOND
CLAIM FOR RELIEF
(Damages: Section 1, Sherman Act)**

123.    Plaintiff repeats the allegations of paragraphs 1 through 122 herein.

124.    The unlawful conduct described herein constitutes a violation of section 1 of the Sherman Act of 1890.

125.    As a result of the foregoing, the Individual Plaintiffs have been injured in their business and property by Defendants' violation of section 1 of the Sherman Act in an amount as yet unascertained, to be trebled pursuant to the provisions thereof, with interest, for which damages Defendants are jointly and severally liable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Bailey and Booker, on behalf of themselves and the other members of the Class, prays for judgment as follows:

1.    Declaring this action to be a proper Plaintiff class action pursuant to Rule 23(b)(1) and/or 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the Class defined in paragraph 8 hereof, declaring Plaintiffs Bailey and Booker to be proper representatives of that Class, and

31

declaring Plaintiffs' counsel to be counsel to the Class;

    2.    Enjoining each Defendant from agreeing, conspiring, or combining with each other, or with other companies in their industry, to exchange information regarding, or to establish, the compensation paid to the Targeted Employees;

    3.    Awarding Plaintiff the costs and expenses in this action, including reasonable attorneys', accountants', and experts' fees; and

    4.    Granting such other relief as the Court may deem just and proper.

In addition, Plaintiffs Bailey and Booker and the Individual Plaintiffs also pray for judgment jointly and severally against each Defendant in an amount to be proven at trial, trebled, plus attorneys' fees, costs, and interest as allowable by law, for violations of the Sherman Antitrust Act.

### JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues triable by jury.

Respectfully submitted:

PELLETTIERI, RABSTEIN & ALTMAN
Arthur Penn, Esq.
Joseph Gorman, Esq.
Tarnsfield Plaza, Suite 6
790 Woodlane Road
Mount Holly, NJ 08060
(609) 267-3390

PROVOST UMPHREY LAW FIRM LLP
Joe Kendall, Esq.
Debbie Branscum, Esq.
3232 McKinney Ave., Suite 700
Dallas, TX 75204
(214) 744-3000

32

PROVOST UMPHREY LAW FIRM LLP
Michael A. Havard, Esq.
490 Park Street
P.O. Box 4905
Beaumont, TX 77704-4905
(409) 835-6000


Of Counsel:

MILLER FAUCHER AND CAFFERTY LLP
Ellen Meriwether, Esq.
One Logan Square, Suite 1700
18th & Cherry Streets
Philadelphia, PA 19103
(215) 864-2800

CARNEY & McKAY
John F. Carney, Esq.
108 Boulevard
Pelham, NY 10803
(914) 738-4001

KLEIN & SOLOMON, LLP
Joseph P. Garland, Esq.
275 Madison Avenue, 11th Floor
New York, NY 10016
(212) 213-1812

GOODKIND LABATON RUDOFF & SUCHAROW LLP
Lawrence Sucharow, Esq.
Barbara J. Hart, Esq.
100 Park Avenue, 12th Floor
New York, NY 10017-5563
(212) 907-0700

CHIMICLES & TIKELLIS LLP
Nicholas Chimicles, Esq.
Michael D. Gottsch, Esq.
One Haverford Centre
3612 West Lancaster Avenue
Haverford, PA 19041
(610) 642-8500

33

FINKELSTEIN THOMPSON & LOUGHRAN
Burton H. Finkelstein, Esq.
Dewall Foundry
1050 30th Street, NW
Washington, DC 2007
(202) 337-8000

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Richard A. Lockridge, Esq.
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900